UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CLAUDE M. STRILIO<br><br>Plaintiff,<br><br>-against-<br><br>SONY MUSIC ENTERTAINMENT,<br><br>Defendant. | 25-CV-4006 (LAP)<br><br>OPINION & ORDER |

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court is Defendant Sony Music Entertainment's ("SME") motion to dismiss Plaintiff's First Amended Complaint (the "FAC," Dkt. 19) and Plaintiff's subsequent motion for leave to amend.[1] For the reasons set forth below, SME's motion to dismiss is GRANTED. Although the Court dismisses Plaintiff's copyright

[1] See SME Memorandum of Law in Support of Motion to Dismiss ("Mot.," Dkt. 21); Declaration of Chiara Genovese ("Genovese Decl.," Dkt. 22); Reply in Support of Motion to Dismiss ("Reply," Dkt. 25); Notice of Supplemental Authority (Dkt. 27); Opposition to Leave to Amend (Dkt. 31); Letter Motion to Disregard Plaintiff's Supplemental Submission (Dkt. 35); Plaintiff's Memorandum in Opposition ("Opp.," Dkt. 24); Plaintiff's Surreply (Dkt. 26); Plaintiff's Response to SME's Notice of Supplemental Authority (Dkt. 28); Plaintiff's Letter Requesting a Pre-Motion Conference for Leave to Amend (Dkt. 29); Plaintiff's Reply in Further Support of Leave to Amend (Dkt. 32); and Plaintiff's Supplemental Submission ("Pl. Supp.," Dkt. 34-1). In addition to these materials and the FAC, the Court has considered the March 5, 1989 agreement between Plaintiff and Formula One (the "Strilio-Formula One Agreement," Pl. Supp. at 2-4); the December 1989 furnishing agreement between Formula One and CBS (the "CBS-Formula One Agreement," Dkt. 1-3), together with its appended Artist's Assent and Guaranty (the "Inducement Letter," Dkt. 1-3 at 63-64) and Instrument of Transfer (Ex. B, Dkt. 1-3 at 62); the March 23, 1990 publishing agreement between Monaco Musique and CRGI Music Inc. (the "Monaco-CRGI Agreement," Dkt. 1-4); the January 22, 1991 amendment to the CBS-Formula One Agreement (the "Amendment," Genovese Decl. Ex. A, Dkt. 22-1); the March 1991 termination agreement between Plaintiff and Formula One (the "Strilio-Formula One Termination," FAC Ex. 2, Dkt. 1-5 at 3-8); and the April 7, 1992 letter agreement between Plaintiff and SME (the "Termination Agreement," FAC Ex. 4, Dkt. 1-7).

claims with prejudice, the Court will permit Plaintiff one opportunity to amend his complaint as to the limited portion of the contractual claims that do not appear facially futile.

## BACKGROUND

### A. Factual Allegations

The Court assumes the following allegations to be true and draws all reasonable inferences in Plaintiff's favor. Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir. 2012).

#### i. The March 1989 Strilio-Formula One Agreement

Plaintiff is a California resident and the member of a band known as "Anything Box." (FAC ¶ 5.) Jon St. James ("St. James") is a record producer who did business as Formula One Music Group ("Formula One"). (FAC ¶¶ 7-8.) SME, headquartered in New York, is the successor in interest to CBS Records ("CBS"). (FAC ¶ 6.)[2]

On March 5, 1989, Plaintiff and Formula One entered into a recording rights and distribution agreement (the "Strilio-Formula One Agreement"). Under the agreement, the parties agreed that Formula One "shall own, in perpetuity, throughout the universe, all right, title and interest in and to all of the results and proceeds of [Plaintiff's] services," including the sound recordings made from those services. (Strilio-Formula One

[2] CBS Records executed several of the older agreements at issue in this Opinion before CBS was acquired by SME. SME does not dispute that SME inherited CBS Records' contractual obligations.

Agreement ¶ 4(a).) In exchange, Formula One agreed to administer a publishing company for Plaintiff's songs, with Plaintiff to receive his full songwriter share and half of the publishing revenue. (Id. ¶ 16.)

**ii. The December 1989 CBS-Formula One Agreement**

Formula One, in turn, entered into a December 1989 furnishing agreement with CBS (the "CBS-Formula One Agreement") through which Formula One agreed to "furnish the services of Claude Strilio p/k/a 'Anything Box'" as a recording artist to CBS. (CBS-Formula One Agreement ¶ 2.01; FAC ¶ 7.) St. James signed the CBS-Formula One Agreement on behalf of Formula One; however, Plaintiff was not a party to the agreement. Instead, Plaintiff executed a separate Artist's Assent and Guaranty (the "Inducement Letter"). Through the Inducement Letter, Plaintiff assented to the execution of the CBS-Formula One Agreement. (Inducement Letter ¶ 1(b).) Plaintiff further agreed to be bound by the CBS-Formula One Agreement's applicable provisions and acknowledged that CBS would have no payment obligations to Plaintiff apart from those specified in ¶ 5.01 and Article 18. (Inducement Letter ¶¶ 1(b)-(c), 2(a)(1).)

The CBS-Formula One Agreement contains two key provisions that are relevant to this motion. First, paragraph 20.01 provides that Formula One hereby "sell[s], transfer[s] and assign[s] to CBS irrevocably all right, title and interest in and to the Master Recordings," including any copyrights, perpetually and throughout

the world. (CBS-Formula One Agreement ¶ 20.01.) The agreement makes no reference to any rights conveyed by Plaintiff personally to CBS.

Second, paragraph 11 requires SME to compute royalties as of each June 30 and December 31 and, on the following September 30 or March 31, to send Formula One a statement and pay "any royalties which are due after deducting unrecouped Advances." (Id. ¶ 11.01.) Each such royalty statement is "deemed conclusively" sent on the date it is due unless SME is notified otherwise within forty-five days. (Id. ¶ 11.03.) Furthermore, any objections to a royalty statement (or to a lack thereof) must be made within two years of the date a statement is sent or deemed sent. (Id. ¶ 11.04.) After that period elapses, the statement, whether or not actually sent, becomes "conclusively binding." (Id.) Finally, any suit concerning a royalty accounting must be commenced within six months of the expiration of that two-year period. (Id.) Recovery of the unpaid royalties is the sole remedy for any breach of the accounting provisions. (Id.)

**iii. The March 1990 Monaco-CRGI Publishing Agreement**

On March 23, 1990, St. James, this time doing business as Monaco Musique, entered into a separate co-publishing agreement with CRGI Music Inc. covering the songwriting services of "Claude Strilio p/k/a 'Anything Box.'" (Monaco-CRGI Agreement at 1.) Plaintiff separately executed an Artist's Assent and Guaranty through which Plaintiff agreed to be bound by the Monaco-CRGI Agreement's applicable provisions and guaranteed Monaco Musique's performance. (Id. at 39-40.) Plaintiff separately executed an assignment conveying his interests in the listed compositions to CRGI. (Id. at 35.) CRGI's successor terminated the agreement on August 28, 1992. (Id. at 42.)

**iv. The 1991 Amendment and the Strilio-Formula One Termination**

Anything Box's first album, Peace, was recorded in partnership with Formula One and released under the CBS-Formula One Agreement in 1990. (FAC ¶¶ 1, 7.) By early 1991, however, the relationship between Plaintiff and St. James soured considerably, leading to a breakup that was memorialized in two agreements.

First, on January 22, 1991, Plaintiff, Formula One, and SME[3] executed an amendment to the CBS-Formula One Agreement (the "Amendment"). Paragraph 2 of the Amendment provides that:

[3] By this point, SME had acquired CBS Records and ceased usage of the CBS name.

> 2. The Furnishing Party [Formula One] assigns to the Artist [Plaintiff] all of the Furnishing Party's rights under the Agreement. Sony consents to that assignment. The Artist accepts that assignment and assumes and agrees to perform all of the obligations of the Furnishing Party under the Agreement.

(Amendment ¶ 2.) Paragraph 3, in turn, deems Plaintiff "substituted for the Furnishing Party as a party to the Agreement" with SME, with Plaintiff's services to be rendered directly to SME "for the remainder of the term of the Agreement." (Id. ¶ 3.)

Separately, in March of 1991, Plaintiff and Formula One executed a different agreement terminating the Strilio-Formula One Agreement (the "Strilio-Formula One Termination"). The Strilio-Formula One Termination provided that "neither [Plaintiff] nor [Formula One] shall have any further rights or obligations thereunder except as otherwise specifically set forth herein." (Strilio-Formula One Termination ¶ 1; FAC ¶ 8.) Plaintiff also agreed to pay Formula One $20,000 upon execution of the Strilio-Formula One Termination, which SME advanced on Plaintiff's behalf against future royalties owed to Plaintiff. (Id. ¶ 2; FAC ¶ 8.) Plaintiff and St. James also directed SME to pay Plaintiff directly all sums otherwise payable to Formula One, subject to an even division of royalties on the master recordings listed in an appended exhibit. (Strilio-Formula One Termination ¶¶ 6-8.)

Following the 1991 agreements, Plaintiff alleges that he oversaw production of an unspecified second album. (FAC ¶ 9 & Ex.

3.) SME allegedly accepted delivery of that album in 1991 but, as alleged by Plaintiff, withheld the $70,000 balance of the recording advance payable on delivery and declined to release the album's first single, notwithstanding a June 1991 demand letter from Plaintiff's counsel. (FAC ¶ 10 & Exs. 1, 5, 22.)

### v. The 1992 Termination Agreement Between Plaintiff and SME

Following the dispute over the second album, relations between Plaintiff and SME continued to deteriorate. On April 7, 1992, Plaintiff and SME formally ended their relationship by a letter agreement (the "Termination Agreement"). Paragraph 1 of the Termination Agreement terminates the CBS-Formula One Agreement and identifies Plaintiff as "successor in interest to Jon St. James d/b/a Formula One Music Group." (Termination Agreement ¶ 1.) In exchange, Plaintiff released SME from all claims, other than claims for royalties, "whether known or unknown," including any obligation to make or release recordings or to make non-royalty payments to Plaintiff. (Id. ¶ 2.) Plaintiff acknowledged the release as a full and final accord and satisfaction and waived section 1542 of the California Civil Code. (Id. ¶ 5(b).)

### vi. Plaintiff's Demands to SME and Section 203 Copyright Notice

As alleged in the FAC, SME sent Plaintiff exactly one royalty statement (in or around 1992) and then went silent, even though Peace remained in commercial release. (FAC ¶¶ 1, 10-11.)

Plaintiff alleges he made numerous objections to the lack of royalty statements from SME, including through various calls in 1997 (Ex. 7), certified mail in 2009 (Ex. 8), notarized letters sent in 2018 and 2019 (Ex. 9), an accountant's inquiry in 2020 (Ex. 19), and a final notarized demand dated April 11, 2025 (Ex. 20). (FAC ¶ 11.) SME, according to Plaintiff, repeatedly insisted that Plaintiff was "not a party" to any agreement with SME and thus not entitled to any royalties. (Id.)

Separate and apart from the royalty statement disputes, on April 12, 2022, Plaintiff served SME with a notice of termination under 17 U.S.C. § 203. (Id. ¶ 12.) The notice claimed to terminate the 1989 grant of rights in Peace and eighteen other titles, with an effective date of March 29, 2024. (Id. & Ex. 14.) The Copyright Office recorded the notice of termination on July 25, 2024. (Id. & Ex. 14.) SME subsequently issued work-for-hire rebuttals to the 2022 termination notice but withdrew Peace from United States streaming platforms. (Id.) However, SME continues to stream the Peace album in twenty-seven foreign countries. (FAC ¶¶ 12, 18 & Ex. 23.)

As construed by the Court, the FAC asserts two causes of action: breach of contract regarding royalties (Count One) and copyright infringement of the Peace album (Count Two). (FAC ¶¶ 14-19.) Plaintiff seeks $2.7 million in damages, declaratory

relief, annulment of the 1989 agreements, a worldwide audit of royalties owed since 1990, and an injunction. (FAC ¶¶ 13, 20.)[4]

## LEGAL STANDARD

### A. Rule 12(b)(6)

To survive a motion to dismiss, a complaint must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). Because Plaintiff proceeds pro se, the Court construes the complaint liberally to raise the strongest arguments it suggests. Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (citing Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006)).

An affirmative defense, such as a statute of limitations defense, "may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." Thea v. Kleinhandler, 807 F.3d 492, 501 (2d Cir. 2015) (quotation marks in citation omitted).

### B. Artist Termination Rights Under Copyright Act § 203

For works other than works made for hire, Section 203 of the Copyright Act provides that:

[4] After briefing was completed, the parties filed supplemental submissions not authorized by the Court. Mindful of Plaintiff's pro se status, the Court has considered every submission on its merits, including those filed without leave of court.

> [T]he exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination . . . .

17 U.S.C. § 203(a) (emphasis added). The purpose of Section 203 is to allow artists or authors who may have initially underpriced their works (such as before the author attained recognition) to reclaim ownership after thirty-five years have passed. See Mills Music, Inc. v. Snyder, 469 U.S. 153, 170–73 (1985). In doing so, Section 203 seeks to "relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product." Id. at 172–73.

Accordingly, Section 203 only permits authors to unwind grants that an author himself "executed." See 17 U.S.C. § 203(a). Thus, a grant executed by a third party is not the author's to terminate. See Waite v. UMG Recordings, Inc., 450 F. Supp. 3d 430, 441 (S.D.N.Y. 2020) (concluding that artists could not terminate grants that furnishing companies had executed); cf. Milne ex rel. Coyne v. Stephen Slesinger, Inc., 430 F.3d 1036, 1042 (9th Cir. 2005) (noting that Section 203 did not apply because the grant at issue "was not made by the author").

**C. Extraterritoriality of the Copyright Act**

"It is well established that copyright laws generally do not have extraterritorial application." Dow Jones & Co. v. Juwai Ltd.,

No. 21-CV-7284 (PKC), 2023 WL 2561588, at *3 (S.D.N.Y. Mar. 17, 2023) (quoting Update Art, Inc. v. Modiin Publ'g, Ltd., 843 F.2d 67, 73 (2d Cir. 1988)). Wholly extraterritorial acts, accordingly, are not actionable under the Copyright Act unless the Plaintiff also alleges a "domestic predicate act [that] was itself an act of infringement in violation of the copyright laws." Levitin v. Sony Music Ent., 101 F. Supp. 3d 376, 384-85 (S.D.N.Y. 2015).

**D. Contractual Period of Limitations and Equitable Tolling**

New York law permits parties to shorten a limitations period by written agreement, see N.Y. C.P.L.R. § 201, and "[a]n agreement which modifies the Statute of Limitations by specifying a shorter, but reasonable, period within which to commence an action is enforceable," Wechsler v. HSBC Bank USA, N.A., 674 F. App'x 73, 74 (2d Cir. 2017) (summary order) (quotation omitted) (emphasis in original). The same principle applies to royalty objection periods. Indeed, "[c]ourts applying New York law routinely uphold the enforceability of contractual incontestability provisions in recording agreements." Allman v. UMG Recordings, 530 F. Supp. 2d 602, 605 (S.D.N.Y. 2008).

However, as with all limitations periods, a contractual limitations period may be subject to equitable tolling. "Equitable tolling applies where a defendant's fraudulent conduct results in a plaintiff's lack of knowledge of a cause of action," Marshall v. Hyundai Motor Am., 51 F. Supp. 3d 451, 462 (S.D.N.Y. 2014), and

requires that the plaintiff exercise due diligence in pursuing the claim once discovery is possible, id. The fraudulent concealment, moreover, must consist of something beyond the allegedly wrongful conduct that prompts the plaintiff to sue. Rather, the "fraudulent misrepresentation must be for the purpose of concealing the former tort." Ross v. Louise Wise Servs., Inc., 8 N.Y.3d 478, 491 (2007).

**E. Releases and Duress**

Under New York law, "a valid release constitutes a complete bar to an action on a claim which is the subject of the release," and if clear and unambiguous, is enforced according to its terms. So long as the release is "fairly and knowingly made," it bars even claims unknown to the releasor at signing. Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V., 17 N.Y.3d 269, 276 (2011) (quotation omitted). While duress can void a release, duress requires "a wrongful threat precluding the exercise of [the releasor's] free will." Austin Instrument, Inc. v. Loral Corp., 29 N.Y.2d 124, 130 (1971). To show duress, a plaintiff must allege "(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative." Kamerman v. Steinberg, 891 F.2d 424, 431 (2d Cir. 1989) (internal quotation marks omitted). Mere economic pressure does not suffice, and "the fact that a party may have engaged in hard bargaining is insufficient to establish duress." Vargas Realty Enters., Inc. v.

CFA W. 111 St., L.L.C. (In re Vargas Realty Enters., Inc.), 440 B.R. 224, 238 (S.D.N.Y. 2010) (quotation omitted).

## DISCUSSION

### A. Copyright Infringement (Count Two)

Plaintiff's copyright infringement claims hinge entirely on the validity of his Section 203 termination notice. Because the Court agrees the operative termination notice was not valid, the Court finds that Plaintiff's current copyright claims are barred.

#### i. Plaintiff Did Not Execute the Grant He Seeks To Terminate Under Section 203

SME contends that the Section 203 termination notice is not valid because Plaintiff did not execute the underlying grant of rights at issue. Specifically, SME argues that the CBS-Formula One Agreement was signed by Formula One, not Plaintiff, and that any grant of a copyright interest in the recordings was necessarily made by Formula One. (Mot. at 9, 26-27.)[5]

The Court agrees. Plaintiff's termination notice identifies the CBS-Formula One Agreement of December 1989 as the grant it seeks to terminate, which Formula One alone executed. But Plaintiff did not execute this grant. Instead, Plaintiff signed the Inducement Letter, which bound him personally to CBS but

---

[5] SME argues in the alternative that the recordings were works made for hire and therefore ineligible for Section 203 protection. The Court need not resolve that fact-bound question in light of the other grounds warranting dismissal.

conveyed no copyright of his to CBS. In doing so, Plaintiff merely assented to grants of rights already held by others and guaranteed the furnishing company's performance.

On this point, the Court finds highly persuasive Judge Cote's decision addressing similar facts in James v. UMG Recordings, Inc., No. 25-cv-4182 (DLC), 2026 WL 63225 (S.D.N.Y. Jan. 8, 2026). There, the members of the recording group Salt-N-Pepa performed as recording artists while the rights in any recordings ran through a production company owned by their producer. Id. at *1. The artists' 1986 recording agreement with that company provided that the company "shall be the sole and exclusive owner of any and all rights, title and/or interest in and to master recordings," including the copyrights. Id.. The producer, in turn, entered into a distribution agreement (to which the artists were not parties) in which the producer assigned any such rights to the label. Id. at *1-2. The artists, however, signed only an inducement letter addressed to the label, by which the artists guaranteed the producer's performance and agreed to be bound "as though [each artist] was a party" to the distribution agreement. Id. at *2. Decades later, the artists, as here, served a Section 203 notice purporting to terminate the 1986 grant.

Judge Cote held that the artists could assert no such termination rights under Section 203. See id. at *5-6. As Judge Cote explained, "the statutory text in § 203 is clear: Plaintiffs

can only terminate copyright transfers that they executed. They cannot terminate a copyright grant executed by [the production company]." Id. at *6 (emphasis added). So too here. Formula One owned the results and proceeds of Plaintiff's services under the Strilio-Formula One Agreement. Thus it was Formula One, not Plaintiff, who executed the grant of Peace recording rights to CBS.[6]

In his supplemental submissions, Plaintiff pivots and argues that the Strilio-Formula One Agreement—not the CBS-Formula One Agreement—shows Plaintiff was the original grantor of rights in Peace recordings. According to Plaintiff, because he has now served St. James with a separate Section 203 notice, he may enforce termination of the rights he conveyed to Formula One in the March 1989 Strilio-Formula One Agreement to the extent that SME now owns those rights. To be sure, Section 203 does not extinguish an artist's termination rights merely because the rights have been transferred to another party. Thus, if Plaintiff's grant of rights to Formula One was in fact a cognizable grant under Section 203, a subsequent termination of any rights conveyed in that original

[6] Plaintiff also argues that the subsequent Amendment between himself and SME assigned him "all of [Formula One's] rights" and notes that SME's own papers call him Formula One's successor. (Opp. at 3, 5-6.) While that may well entitle Plaintiff to royalties owed to Formula One, it cannot create termination rights under Section 203 when none existed in the first place. Formula One never held a termination right because it was not an author within the meaning of Section 203.

transfer could well be effective on the current holder of the rights.

The problem for Plaintiff is that the operative termination notice makes no reference to that original March 1989 agreement. It identifies only the rights conveyed in the December 1989 CBS–Formula One Agreement. As noted, a notice of termination must identify the grant to which it applies and cannot be recast after the fact as terminating a different grant. And even if Plaintiff's amended termination notice was properly served on SME mid-litigation, it would still not be effective for two years after notice. Accordingly, to the extent that Plaintiff seeks to unwind and enforce rights in his amended notice, this lawsuit is premature.

**ii. Plaintiff Alleges No Domestic Act of Infringement**

The Court also agrees with SME that Count Two fails independently because Plaintiff pleads no act of infringement within the United States. The FAC expressly concedes that SME withdrew Peace from United States platforms and that the offending conduct occurs in numerous foreign countries. (FAC ¶¶ 12, 18.) Moreover, Plaintiff's assertion that SME demonetizes Plaintiff's own YouTube videos appears only in his opposition brief and in any event describes conduct directed at Plaintiff's postings rather than reproduction or distribution of the Peace recordings. Count Two would therefore fail even if the termination notice were valid.

Accordingly, SME's motion to dismiss Count Two is GRANTED, and Count Two is dismissed with prejudice.

**B. Breach of Contract (Count One)**

Count One appears to allege three distinct theories of contractual breaches: (i) SME's failure to render royalty statements for thirty-three years, (ii) SME's failure to pay mechanical royalties, and (iii) SME's failure to pay Plaintiff the $70,000 balance of the second-album advance. The Court addresses each in turn.

**i. Royalty Statement Claims**

a. Pre-September 2023 Royalty Claims

As noted, pursuant to paragraphs 11.01 and 11.04 of the CBS–Formula One Agreement, royalty statements are deemed conclusively sent each September 30 and March 31. Any objection must be made within two years of that date, and the statement becomes conclusively binding when those two years run. Furthermore, any lawsuit must be filed within six months of that two-year period. (CBS–Formula One Agreement ¶¶ 11.01, 11.04.)

Assuming arguendo that Plaintiff's cited demands qualify as objections (Mot. at 15), the only timely demand would be Plaintiff's purported April 11, 2025 demand for a royalty statement. That demand would apply to statements due no earlier than April 11, 2023, meaning that the first statement deemed sent after that date would be the statement due September 30, 2023.

But as to Plaintiff's earlier demands, such as those in 1997, 2009, 2018, 2019, and 2020, any claims are plainly untimely because Plaintiff failed to file suit within six months of the end of the two-year objection period. Accordingly, every royalty statement claim predating September 30, 2023, is barred by the contractual limitations period.

Nor does equitable tolling save Plaintiff's untimely claims. Far from alleging any fraudulent concealment, the essence of Plaintiff's claim is that Plaintiff did believe that statements were owed in 1997, 2009, 2018, 2019, and 2020 and informed SME accordingly. (FAC ¶ 11.) It was on Plaintiff to file suit timely if he disagreed with SME's response that Plaintiff was not entitled to royalties for the applicable period. Moreover, to the extent Plaintiff alleges any "concealment" by SME, that concealment is the failure to deliver statements, which is itself the breach over which Plaintiff has now sued. "A case without allegations of affirmative wrongdoing, where the alleged concealment consisted of nothing but defendants' failure to disclose the [alleged] wrongs they had committed, does not justify equitable tolling." Titus v. UMG Recordings, Inc., 2023 WL 8039622, at *8 (S.D.N.Y. Nov. 20, 2023). Accordingly, Plaintiff's claims remain time-barred.

b. Post-September 2023 Royalty Claims

The otherwise timely post-September 2023 contractual claims fail as currently pleaded. As SME notes, paragraph 11.01 obligates

SME to pay only royalties "due after deducting unrecouped Advances" that were previously expended on Plaintiff's behalf. (See CBS-Formula One Agreement ¶ 11.01.) And ¶ 11.04 makes recovery of those royalties the "sole remedy" for any royalty accounting claims. (CBS-Formula One Agreement ¶ 11.04.) But Plaintiff does not allege that SME has been repaid for those advances. So long as SME has not generated enough income to recoup those advances, SME owes Plaintiff no royalties. Because Plaintiff does not allege any specific facts indicating that SME owes such royalties, this portion of Count One fails as currently pleaded.

Moreover, as to SME's alleged failure to deliver the royalty statements themselves, the FAC alleges a single, undifferentiated thirty-three-year breach and seeks a worldwide audit of SME's records since 1990. (FAC ¶¶ 15, 20(b).) Whether ¶ 11.04's sole-remedy clause would bar a narrower contractual claim regarding SME's alleged failure to provide sufficient royalty data in the post-September 2023 period is a question that the Court need not resolve at this stage.

In any event, Count One, as currently pleaded, does not plausibly allege a breach of contract in the post-September 2023 window. But because an amended and more specific claim might, the Court dismisses this portion of Count One without prejudice.

**ii. The CRGI Mechanical-Royalty Claim**

SME also contends that Plaintiff is ineligible for mechanical royalties because the compositions at issue are governed by the Monaco-CRGI Agreement. The Court agrees. The Monaco-CRGI Agreement was executed between St. James, doing business as Monaco Musique, and CRGI Music Inc. (Monaco-CRGI Agreement at 1.) Neither Plaintiff nor SME was a party to that agreement. Thus, even if Plaintiff did have standing to enforce the agreement, the FAC does not allege that SME ever inherited CRGI's contractual obligations. (Reply at 6 n.7.) Accordingly, Plaintiff cannot recover from SME for purported breaches of the Monaco-CRGI Agreement.

**iii. The 1991 Advance**

Plaintiff's advance claim rests on ¶ 6.02(b)(5) of the CBS-Formula One Agreement, which made the balance of the second-album advance payable within thirty days of delivery, and on SME's acceptance of that album in 1991. (CBS-Formula One Agreement ¶ 6.02(b)(5); FAC ¶ 10 & Exs. 1, 22.) That claim also fails for multiple reasons.

First, the advance claim appears facially untimely under New York law. The advance came due within thirty days of delivery, no later than the June 17, 1991 demand letter. Accordingly, under New York's six-year statute of limitations for contract claims, Plaintiff's window to bring suit in expired in 1997. See N.Y. C.P.L.R. § 213(2).

Second, Plaintiff released the advance claim in the Termination Agreement. There, Plaintiff released SME from "any and all claims . . . whether known or unknown," expressly including "any and all obligations . . . to make any payments to you." (Termination Agreement ¶ 2.) In response, Plaintiff offers a theory of duress, alleging that he signed the Termination Agreement "facing an uncertain future, fearing continued creative rejections and a career stranglehold." (Opp. at 7.) But duress requires "a wrongful threat precluding the exercise of [the releasor's] free will," Austin Instrument, 29 N.Y.2d at 130, which must be "unlawfully made" and leave the victim with "no other alternative," Kamerman, 891 F.2d at 431. Plaintiff identifies no such threat or otherwise unlawful conduct by SME.

Accordingly, SME's motion to dismiss Count One is GRANTED with prejudice as to the pre-September 2023 royalty statement claims, the mechanical royalty claim, and the advance claim, and without prejudice as to the post-September 2023 royalty statement claims.

**C. Leave To Amend**

Under Federal Rule of Civil Procedure 15(a)(2), leave to amend should be freely given as justice requires. A pro se plaintiff ordinarily receives at least one opportunity to replead, Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000), but leave is properly denied as futile where the defect is substantive and "better

pleading will not cure it," id.; that is, where the proposed amendment "could not withstand a motion to dismiss," Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir. 2002).

As the Court noted, amendment would be futile as to the copyright claim because Plaintiff's copyright theory fails as a matter of law. Similarly, amendment would be futile as to the pre-September 2023 contractual claims, which are plainly time-barred, and as to the mechanical royalty claim and the advance claim, which is both untimely and released. Accordingly, leave to amend the copyright claim, the pre-September 2023 royalty statement claims, the mechanical royalty claim, and the advance claim is DENIED as futile.

Plaintiff's post-September 2023 royalty statement claims are different. As noted, the FAC does not assert a claim confined to the statements due on or after September 30, 2023, or seek relief tailored to SME's alleged failure to render those specific statements. A second amended complaint tailored to the post-September 2023 period may not be futile if Plaintiff pleads more specific allegations indicating that he is in fact owed royalties from SME. Accordingly, leave to amend is GRANTED solely as to a contractual claim for failure to pay royalties or deliver royalty statements due on or after September 30, 2023. All other claims are dismissed with prejudice and may not be repleaded.

## CONCLUSION

For the foregoing reasons, SME's motion to dismiss is GRANTED. For the sake of clarity, the Court summarizes the status of each count below:

- Count One is DISMISSED WITH PREJUDICE as to the pre-September 2023 royalty statement claims, the mechanical royalty claim, and the advance claim.
- Count One is DISMISSED WITHOUT PREJUDICE as to any claims arising from statements due on or after September 30, 2023.
- Count Two is DISMISSED WITH PREJUDICE.
- Leave to amend is GRANTED solely to permit a second amended complaint as to the post-September 2023 breach-of-contract claims. Plaintiff must file the second amended complaint within thirty days.

If Plaintiff does not file a second amended complaint within thirty days of the date of this Order, the Clerk of the Court shall terminate this action and enter judgment for SME accordingly.

The Clerk of the Court shall close Dkt. 20 and mail a copy of this Order to Plaintiff.

**SO ORDERED.**

Dated: New York, New York
September 23, 2026

Loretta A. Preska

LORETTA A. PRESKA
Senior United States District Judge